**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 16-cr-00284-CMA

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**DONALD ILEY,**

**Defendant.**

_____

**REPORTER'S TRANSCRIPT**
**(Continued Sentencing Hearing)**

_____

Proceedings before the HONORABLE CHRISTINE M. ARGUELLO, Judge, United States District Court, for the District of Colorado, commencing at 3:05 p.m. on the 25th day of July, 2017, Alfred A. Arraj United States Courthouse, Denver, Colorado.

**A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
J. CHRIS LARSON, U.S. Attorney's Office - Denver, 1801 California St., Suite 1600, Denver, CO 80202

**FOR THE DEFENDANT:**
GARY LOZOW, Foster Graham Milstein & Calisher, LLP, 360 South Garfield Street, 6th Floor, Denver, Colorado 80209

1                            **JULY 25, 2017**

2              (Proceedings commence at 3:05 p.m.)

3              THE COURT:  You may be seated.

4              Court calls Criminal Case No. 16-cr-000284-CMA,

5    encaptioned United States v. Donald Iley.

6              Counsel, would you please enter your appearances.

7              MR. LARSON:  Good afternoon, Your Honor, Chris

8    Larson for the United States.

9              THE COURT:  Good afternoon.

10             MR. LOZOW:  Your Honor, Gary Lozow on behalf of

11   Mr. Iley, who is present in custody.

12             THE COURT:  Good afternoon.

13             For the record, the Court also notes that Officer

14   MariJo Paul, representing the United States Probation

15   Office, is also in attendance at this hearing.  Good

16   afternoon.

17             PROBATION OFFICER:  Good afternoon, Your Honor.

18             THE COURT:  This is a continuation of a sentencing

19   hearing that began on July 13, 2017.  At that sentencing

20   hearing, rather than listening to the argument of counsel

21   and allocution of the defendant and then surprising the

22   parties with the Court's sentence, this Court followed its

23   normal sentencing protocol.

24             The Court's normal protocol is to provide both the

25   defendant and the Government with the Court's entire

1    3553(a) analysis and justification, and to give the

2    defendant and the Government the benefit of its

3    inclination with regard to what the Court considers to be

4    a sufficient, but not greater than necessary, sentence

5    prior to sentencing -- prior to hearing any argument or

6    allocution from the defendant.

7          This Court developed this protocol, and I realize

8    in Colorado it is somewhat unique.  But I developed it

9    because I believe that this protocol provides more

10   transparency regarding sentencing, and it gives both

11   parties advance notice of the matters that are of concern

12   to and will impact the Court's final sentencing decision.

13   In this way, counsel and the defendant are able to better

14   focus their arguments or statements on the matters that

15   are going to impact the Court's final sentencing

16   determination.

17         Upon hearing that the Court was inclined to upward

18   depart from the advisory guideline range, the defendant

19   requested a continuance of the sentencing hearing.

20   Although the Court was not required to give advance notice

21   of its intent to upward vary from the advisory guideline

22   range, the Court granted the defendant's oral motion for a

23   continuance, and rescheduled the sentencing hearing to

24   today.

25         And that was the date that was agreed to by both

1    defendant and the Government.  So that is where we stand

2    today.

3         I want to clarify a few things before I hear from

4    counsel and then from Mr. Iley.

5         In his Amended Sentencing Statement, Mr. Lozow, you

6    say, "This Honorable Court has obviously come to the

7    conclusion that Mr. Iley had been untruthful with the

8    probation department and had indulged in a lavish

9    lifestyle."

10        That was somewhat of a misstatement of what I

11   actually said.  So I will clarify for you exactly what it

12   was I said.  And I will withdraw the "attending football

13   games in box seats," because apparently the probation

14   department, while having seen pictures, is not able to

15   actually say, yes, that's what he had.

16        It doesn't matter, because there is still evidence

17   that he was living a lavish lifestyle with the moneys.

18   And the point of that reference was that he wasn't

19   stealing from clients because he needed to.  It wasn't

20   like he was needing to have this money.

21        And what I said was, "although now that he has been

22   caught, the defendant expresses remorse for his actions.

23   At the time he was stealing from his clients, it was not

24   because he needed to.  He was living a lavish lifestyle

25   with the moneys he stole from his hardworking clients.  He

1    was living in a multi-million dollar home at the time,

2    traveling with his family, paying for his children's

3    college and private school tuition."  Then I said,

4    "Attending football games in box seats," which I will

5    remove from my statement.  "Enjoying shows, and spending

6    the victims' money, with no apparent remorse at the time."

7          With respect to the other statement, that he has

8    been "untruthful," I never said he was untruthful, I just

9    said he wasn't totally honest.  My statement was, "the

10    Court is disturbed by the fact that the defendant has not

11    been forthcoming and honest about his finance situation."

12          Now, perhaps I should have put in there, "totally

13    honest."  But the whole point of it was, he wasn't

14    forthcoming.  The probation office -- and this is

15    continuing the quote.  "The probation office indicates

16    that it asked defendant numerous times throughout the

17    presentence investigation to provide documentation of his

18    financial condition.  While he has verbalized a

19    willingness to provide the documents, he has been only

20    minimally responsive to these requests."  That is what was

21    reported.

22          And you made some arguments about the bankruptcy

23    trustee and all of that.  It doesn't matter whether the

24    bankruptcy trustee included the IRS in the matter.  That

25    is not going to get these folks off the hook for the taxes

1    that are owed with the IRS.

2            Finally, I want to be -- I want the record to be

3    clear that I did not just willy-nilly pick 180 months out

4    of thin air.  United States Sentencing Guidelines, Section

5    2B1.1(b)(2)(B) indicates that if the offense resulted in

6    substantial financial hardship to 5 to 24 victims,

7    increase the offense level by 4 levels.  And (C) says, if

8    it is 25 or more victims, increase it by 6 levels.  There

9    are 142 victims in this case.

10           Now, I am not sure why the Government did not

11   include this enhancement.  But it is clear to me from the

12   victim impact statements and the oral statements that were

13   made by the victims in court at the July 13th hearing,

14   that the defendant's conduct did result in substantial

15   financial hardship to more than 5 victims.

16           I am not going to reiterate the entire summary of

17   the impact that I put on the record at the last hearing.

18   But several of the victim indicated that they lost their

19   businesses.  Many had to go into their retirement and/or

20   savings to pay back the IRS the amount that was supposed

21   to have been paid to the IRS but instead was stolen by

22   Mr. Iley.

23           So, basically, the actual loss to them is double

24   the amount Mr. Iley stole from them.  And at least one

25   victim indicated that the IRS was also adding penalties

1    and interest to the amount due to the fact that his debt

2    to the IRS was late and hadn't been paid.  And, therefore,

3    he is actually paying triple the amount.

4          If you look at note -- I believe it is 4(F) of

5    2B1.1, it defines "substantial financial hardship," and it

6    says:  In determining whether the offense resulted in

7    substantial financial hardship to a victim, the Court

8    shall consider, among other factors, whether the offense

9    resulted in the victim, one, becoming insolvent.  There

10   were several that said that happened to them.

11         Two, filing for bankruptcy under the bankruptcy

12   code.

13         Three, suffering substantial loss of a retirement,

14   education, or other savings or investment fund.  And

15   several indicated that that happened to them.

16         Four, making substantial changes to his or her

17   employment, such as postponing his or her retirement

18   plans.

19         Five, making substantial changes to his or her

20   living arrangements, such as relocating to a less

21   expensive home.  That was indicated by a number of the

22   victims.

23         And, six, suffering substantial harm to his or her

24   ability to obtain credit.

25         I'm not sure why the Government did not pursue this

1    enhancement.  But I understand that it was looked at by

2    the probation officer.  And when they asked the Government

3    about it, the Government advised that it did not intend to

4    argue for this enhancement, so it was not applied.

5         Had the offense level been enhanced pursuant to

6    United States Sentencing Guideline 2B1.1(b)(2)(B), I

7    originally assumed, because it was 4 levels, that we would

8    go up to an offense level 34.  I checked with probation,

9    and was told that, no, 2 levels had already been checked,

10   so it would actually only go up to an offense level 32.

11        Had I gone up to an offense level 34, which is what

12   my original calculation was based on, we would be looking

13   at a sentence of 151 to 188 months, and that was within

14   the 180 months that I was considering.

15        Having been corrected by the probation department,

16   the offense level would be 32, and the advisory guideline

17   sentence would be 121 to 151 months.  After taking that

18   into consideration, and reading the argument that

19   Mr. Lozow made, I did decide to adjust the variance that I

20   made to the lower level of this advisory guideline range,

21   rather than the higher level, as I had originally intended

22   under 34.

23        And it is my inclination to sentence him to 151

24   months, concurrent on both of those counts, and then

25   everything that I have said before.

1       So, with that being said, Mr. Lozow, if you and

2   Mr. Iley would approach the podium.  I will hear from you,

3   then I will hear from Mr. Larson, and finally then from

4   Mr. Iley, if he wishes to make any statement on his own

5   behalf.

6       MR. LOZOW:  Judge, first I appreciate the Court's

7   opportunity to let us respond.  We have filed a document

8   that talks about some of the issues.  I want to come back

9   to two things the Court said.  I want to do a little

10  cleanup, to some extent, of some of these documents.

11      The Court got a letter from Mrs. Iley's bankruptcy

12  attorney -- it was designated as "E" -- that we got last

13  night at 12:45 a.m., although the request was made the

14  middle of last week.  I did get confirmation from my

15  office at about 1:15.  But there was a signed letter,

16  which we will substitute and put in the record, rather

17  than the unsigned letter.

18      THE COURT:  All right.  And what I need for you to

19  do, Mr. Lozow, is if you want these filed under seal, you

20  have to give them to probation.  That is the only way

21  there is a presumption and it gets done.  Otherwise, you

22  have to file a motion.  And my office has advised you that

23  you have to file a motion.  You can't just file these

24  documents and think that they are going to be under seal.

25      MR. LOZOW:  Which we have filed motions

1    contemporaneous with these last filings, Judge.  We had

2    gotten a different suggestion in other cases.  And we'll

3    certainly learn from the experience.

4          But there was no effort to kind of open this in

5    some fashion that we thought was inappropriate.  To the

6    contrary, we want the same restriction that the Court

7    gives us.

8          THE COURT:  Right.

9          MR. LOZOW:  So that letter now has been confirmed.

10   Likewise, we may cite a case in the argument.  We have

11   given a copy of the case to Mr. Larson.  And we have also

12   given a copy of the decision to the Court's bailiff for

13   review, if we decide to cite the case, Judge, and that

14   this <u>Vanderwerff</u> case, which is at 788 F.3d 1266.

15         Finally, the Court probably got, since we got this

16   pleading filed, actually, last night, I believe, there was

17   some substitution of an the exhibits, and we had to file a

18   motion to make A B and B A.

19         THE COURT:  And I can honestly tell you, I don't

20   really pay attention to the numbering.  I just read the

21   document.  So I didn't even notice it until you filed it.

22         MR. LOZOW:  Well, I didn't notice it until about 11

23   o'clock, and then had this revulsion about another mistake

24   I had made, so I wanted to correct it, Judge.

25         I think, going back just little bit here with

1    regard to, I think, some of the conceptions that I saw in

2    the victims' statements, makes a bit of sense about the

3    process, because the process worked in the following ways.

4            And I am not going to get into detail on all of the

5    negotiations.  But I want to tell the Court -- and this is

6    not the best practice, actually, for a defense attorney.

7    But Mr. Larson was ironfisted concerning the case.  This

8    wasn't a case where he was busy giving me this concession

9    and that.

10            To the contrary, he made one offer, then had to

11    amend the offer because of an enhancement that came up.  I

12    made one offer, which he summarily thought was

13    inappropriate, and we moved on, and pled -- and I think it

14    is important to talk about even that process just for a

15    moment.

16            When a lawyer tells a client what the parameters of

17    the case are, he has to give them the worse-case and

18    best-case scenario.  But, particularly in the federal

19    system, there is a very finite breakdown on the issues

20    that the Court will take into account, for the most part,

21    with regard to these guidelines.

22            And, so, when these guidelines became part of the

23    plea negotiations, they were highlighted in the plea

24    agreement.  And the guidelines and the elements that kind

25    of affected my client's decision, are reflected in the

1    plea agreement, and they talk about the things that the

2    guidelines consider.

3         You get an enhancement based upon the amount of

4    money that is involved.  That was a 20-level enhancement

5    in this case.  Along the way in the case -- and I want the

6    Court and the record to reflect this -- Mr. Larson was

7    preoccupied with protecting these victims, getting

8    restitution issues that were consistent with what the loss

9    was, providing us with input along the way.

10        And the Court knows that number went up a little

11   bit, went down a little bit.  But, during the time frame

12   that Mr. Iley was dealing with the probation department,

13   let me just say that Mr. Larson was resolute about trying

14   to get to a level of restitution that was appropriate, and

15   wouldn't include and take up a number of the Court's hours

16   on issues concerning restitution.

17        I think the other thing that the Court, I am sure,

18   is aware, is that we pled to a count that was a fairly

19   standard resolution of a case like this.  There wasn't

20   anything given to us with regard to some gift here.  He

21   pled to two felonies.

22        And, the levels of increase, with regard to his

23   exposure, included the fact that there were 10 or more

24   victims.  That was taken into account in the plea.

25   Mr. Iley understood that.  He agreed to, including in the

1    plea agreement, this issue about his prior administrative

2    issue and what that meant.  That was a bit of a bump that

3    was not in the first level of negotiation, but we reserved

4    the right to talk about that one, and we did.  And

5    certainly the Court ruled as it thought appropriate

6    concerning that increase.

7         And there was an abuse-of-trust bump with regard to

8    the sentencing.  That also took into account, in large

9    measure, the issues the Court talked about in terms of

10   violating that trust with his clients.

11        So, when we pled to this -- and I want to -- this

12   is, I think, worth mentioning to the Court.  The Court

13   commented in its prior comments in court that I, who had

14   been doing this for a long time, should have known or had

15   some sense that the Court is predisposed to thinking that

16   these guidelines concerning white collar crimes are too

17   soft or too lax or something to that extent.

18        I will tell you --

19        THE COURT:  I just want to say, I have never hidden

20   that.

21        MR. LOZOW:  Well, no.  But, again, I have never

22   been here where you have disclosed it.  So I have had

23   cases in front of you that had dead bodies.  I have had

24   cases in front of you that have had dramatic drug

25   involvement.  And there has never been a period of time

1    where I thought that you weren't forthright and kind of

2    got to the issues and talked about the issues.

3         But, I will tell you, as an officer of the court,

4    that, indeed, this laxness with regard to this guideline

5    was something that I didn't talk to Mr. Iley about,

6    because I thought that the Government had extracted what

7    it could, in every sense of the word, in terms of those

8    things that it could prove, by this plea agreement.

9         And, to be candid with the Court, and I have said

10   something in my paperwork about it, and I want to come

11   back to that.  But, I, for one, have learned a lesson.  I

12   don't know how long I will be exercising this work in the

13   future.  But next time around, I assure you that that will

14   be an admonition that I will give to a client.

15        And, perhaps, in the last analysis, that kind of

16   disclosure on the front end, in a case like this, which

17   was not hidden, set out in this Indictment, might have at

18   least made Mr. Iley think again about pleading to this

19   case.

20        Now, I think those things are relatively important,

21   because at the time somebody enters a plea, you know, they

22   have to kind of recognize that this can be a day involving

23   a future sentence, which Mr. Iley was keenly aware of.

24        And so I want to tell you that when we came to

25   court 10 days ago, we didn't come to court thinking that

1    he was going to get probation.  And we didn't come to

2    court thinking -- we had asked for a departure.  We didn't

3    come to court asking for a variance.

4         This was the sentence of a series of acts that

5    justified a criminal sentence of import.  And Mr. Iley

6    walked into court knowing that, indeed, he was probably

7    looking, because, to be candid with the Court, I wouldn't

8    have been surprised by a sentence at the 121-month range,

9    which was the top of the guidelines, with regard to what

10   he was facing in terms of the plea agreement that he

11   signed.

12        And, with all due respect, Mr. Iley was going

13   nowhere.  He understood you might -- and I did do that,

14   and I did know, because I have been in front of you

15   before, that you don't necessarily agree with this remand

16   issue wholesale.  And you may remember, I had a guy who

17   was having a liver transplant, and I had to get the

18   medical information for you to even have you consider that

19   issue.

20        So I think the Court's comments about that, even

21   listening -- if I am a victim in this case, that you

22   thought that Mr. Iley had access to this $10 million and

23   could abscond, if I was sitting in the back of the

24   courtroom, I would have been more concerned, perhaps, than

25   many of the victims should be, because that simply isn't

1    factually correct.

2         Now, coming to some of the things -- additional

3    things I want to talk about.  I think that there is, in

4    this case, an issue that has been subtly visible.  And I

5    can get this case.  In this <u>Vanderwerff</u> case, which we

6    cited at 788 F.3d 1266 -- that is not in my moving papers.

7         But this is a case where a colleague, Judge Kane,

8    ended up deciding that he had some very, very deep disdain

9    for plea bargaining, and particularly as it related to

10   appellate waivers.

11        The District Court was clear that Judge Kane's

12   disdain for plea bargaining, and his instincts about why

13   that was inappropriate in a case like this, as it applied

14   to an appellate waiver, was summarily dismissed as being,

15   number one, not appropriate.  And, number two, overlooking

16   what plea agreements are really all about.

17        And, in this case, I think, again, it applies to

18   some extent with the Court's disdain for the guidelines.

19        THE COURT:  I have no disdain for the guidelines.

20   I merely don't think that they are strong enough with

21   respect to white collar crime, compared to other crimes,

22   such as crack cocaine or drug crimes.

23        So I have no disdain for them.  I just think that

24   they are too low.  And they are only advisory to me.  And

25   so if you wanted to have a sentence within that range,

1    then you needed an 11(c)(1)(C), and then I would have

2    decided if I would have accepted an 11(c)(1)(C).

3         MR. LOZOW:  I assure you that I pursued that with

4    vigor, and came in second with regard to that request.  So

5    that wasn't overlooked as an option in the case.

6         But, the Court well knows -- and we cite the <u>Evans</u>

7    case.  There was even some reference in the <u>Evans</u> case --

8    the second <u>Evans</u> case, to exactly that predilection by the

9    Court, in terms of a case that was up on appeal.

10         THE COURT:  They were just ticked off because I

11    didn't follow their orders the first time.

12         MR. LOZOW:  I think that --

13         THE COURT:  And, in that case, for them to tell me

14    there was no loss, when I had a bunch of people sitting

15    back there that had lost $12 million, I wasn't going to go

16    that route.  I felt there was loss.  I came down to 5.4

17    million on that.  They disagreed with that and said there

18    was no loss.

19         So, that is their right, and I have to abide by

20    that.  And I was actually glad when they referred it to

21    another judge.

22         MR. LOZOW:  And, again, my instinct again, of

23    course through the prism of a defense attorney, is that

24    those types of issues in a case where the Court uses 3553

25    to make its variance decision, I think, ignores, in part,

1    as we said in our moving papers, subsection (6) of 3553.

2         And I will come back to that, but I want to at

3    least indicate to the Court that the plea bargain in this

4    case had its own cleansing element to it.  It was done in

5    a timely fashion.  It was done on the heals of a

6    disclosure wholesale to a room full of agents, federal

7    agents, all kinds of agents, multiple U.S. attorneys, and

8    was done in a timely fashion, which, in theory, is

9    supposed to benefit the defendant.

10        I know the Court has modified its thinking, and I

11   appreciate the Court's modification.  Of courses, we are

12   going to ask the Court to come, perhaps, to the bottom of

13   that guideline, because I think that is, perhaps, where

14   the sentencing should be, and I want to talk about that

15   issue, as well.

16        I would respectfully suggest that when Mr. Iley

17   admits wrongdoing, admits wrongdoing that means he is

18   probably going to likely be in jail for 8, 9, 10 years,

19   and takes the effort along the way to make this

20   restitution issue one that becomes framed in a way that

21   the Court can take it up and make an order and make a

22   forfeiture order in some timely fashion and easy fashion,

23   I think is another issue that shows his cooperation.

24        And I think that counts when a Court is looking at

25   this kind of a case.  And I also think that the dialog

1    with the probation department -- and I will tell you as

2    best I can, we kind of included the back and forth on

3    that.  It is almost impossible, I think, in the last

4    analysis, to embrace anything Mr. Iley has done in his

5    life that militates against this offense, because it is

6    all encompassed.

7         I will tell the Court, my parents had a small

8    grocery store.  My wife had a small business.  My law

9    firm, when I first started, it had two people in it.

10   Small businesses were hurt in this case in many different

11   fashions, and that felt close to me to some extent.

12        But the system is majestic with regard to kind of

13   treating people in some fair fashion and consistent, I

14   think, with what the reality of their case is.  We sent

15   you e-mails in this case.  There wasn't one moment of

16   suggestion along the way that Mr. Iley was trying to avoid

17   or be dishonest.  And the Court used the word "dishonest."

18        THE COURT:  No, I did not use "dishonest."  I did

19   not use "dishonest."

20        MR. LOZOW:  All right.  Let me see if I can --

21        THE COURT:  I will read exactly what my script

22   said.  "He has not been forthcoming and honest about his

23   financial situation."

24        MR. LOZOW:  All right.

25        THE COURT:  I never said dishonest.

1          MR. LOZOW:  I don't want to kind of parse words

2     with the Court.  But "not being honest" and "dishonest,"

3     to me, are somewhat consistent.  But, what I am saying to

4     the Court is, that along the way with this probation

5     department, Mr. Iley was facing a number of different

6     things, as well as his wife, and I was reviewing those

7     items.  And when I went to talk to the probation

8     department, the inference was, to some extent, that the

9     concern was his wife, and the fact that he didn't talk

10    about his wife's assets with regard to this bankruptcy

11    process.

12          And, as a lawyer, I hadn't had much contact with

13    his bankruptcy -- his wife's bankruptcy lawyers, but it

14    was my instinct -- and I told Mr. Iley, I said, I think

15    before you start talking about your wife's assets in a

16    bankruptcy setting, where she had been deposed twice under

17    oath, had been subject to a rigorous effort by the trustee

18    to kind of focus on the issues that would best benefit the

19    victims in the case, it was my advice, and it was my

20    conclusion that those matters should be ventilated through

21    her attorney.

22          And once that became clear, they talked to

23    Mr. Berken.  You have a lengthy letter from him.  And my

24    meeting -- and when you are trying to pack this in in 10

25    days, my meetings suggested to me that the probation

1    department was most concerned about withholding

2    information that he should have given about his wife's

3    assets.  And that was the lion's share of the discussion I

4    had with them.  That is why I put that in my moving

5    papers.

6         I don't think he was dishonest.  I don't think he

7    was not totally honest.  I think he did exactly what he

8    should have done, in terms of providing information.

9    Sometimes it was slow in coming.  But, in the interim, he

10   was also looking at these restitution issues.  He was also

11   looking at moving.  The family had been told it had to

12   move out of its home, which will be sold and will be for

13   the benefit of the victims in this case, by June 1st.  He

14   had to move the family.

15        And Mr. Larson was peppering us with these ideas

16   about what is restitution, what are we agreeing upon?  And

17   we were also hearing from the probation department about

18   that issue; are you going to agree to this?  Is this going

19   to be a stipulation?

20        And, to be candid with the Court regarding my take

21   on this, when I -- this Bronco thing is like a throw away.

22   I get it.  I really do get that.  But what caught my

23   attention is that we pulled down every picture that was on

24   the wall.  I called my client's wife and said, find that,

25   because you know that -- Mr. Iley is telling me that that

1    isn't the case.  And she did.  And we looked at every

2    picture.  And I happen to think that, again, it isn't easy

3    for any probation department to kind of engender any

4    positive feelings about Mr. Iley in the setting that they

5    found him in and what he was doing.

6         But, I, for one, think that we did very well in

7    getting the information to them.  Got everything to them.

8    And when there was any question -- and this, I think, is

9    important, too.  If the Court could have sat through this

10   bankruptcy or been involved in it, which I am not asking

11   the Court to be a bankruptcy judge, it was one intense

12   bankruptcy.

13        And Mr. Connolly, who I have worked with in the

14   past, is one of the most aggressive trustees imagined.

15   Which is his job.  And the reason we put this in the

16   moving papers, and I think the Court maybe didn't quite

17   understand what we were trying to do.  We asked

18   Mr. Connolly to join the IRS in the bankruptcy so that --

19   and that doesn't make any difference with the Government.

20   People lost the money.  He took the money.  I understand

21   that.

22        But the idea -- the legal idea was if they had been

23   joined in that same bankruptcy, they could have been

24   discharged as a particular party concerning the victims'

25   obligations to them.

```
 1         THE COURT:  But the bankruptcy -- she had no
 2   obligation.  How could the IRS be joined?  I taught
 3   bankruptcy law for 7-and-a-half years.  I practiced it for
 4   8.  So I know the bankruptcy code.  There is no way that
 5   the trustee could have brought in the IRS for her
 6   bankruptcy.  She didn't owe them anything.
 7         MR. LOZOW:  You mean his bankruptcy.
 8         THE COURT:  His bankruptcy.  He didn't owe them
 9   anything.  They all owed the IRS because of what he did.
10         MR. LOZOW:  There is another provision that we have
11   been given notice of that the IRS still may come after my
12   client for additional funds other than the moneys that
13   were involved in this case.  And, I will tell you -- and
14   not -- again, not to argue with the judge, much less a law
15   professor, we actually found a case, and sent it on to
16   Mr. Larson, sent it on to Mr. Connolly, sent it on to the
17   bankruptcy attorneys, that I thought opened the door to
18   the possibility of getting the IRS off the victims' backs.
19         It was discounted.  They didn't do it.  The lawyers
20   that ended up representing, to start with, changed, one of
21   the lawyers.  But the effort wasn't, you know, to gain any
22   favor for Mr. Iley, the effort was to try to see if we
23   could get the IRS to do something different, as
24   Mr. Merriam talked about, concerning the sentencing
25   hearing.
```

1          That fell on deaf ears.  And I will get something

2     to the Court to show you the case that I cited that I

3     thought opened that door.  Again, they were talking to an

4     old criminal defense attorney, and maybe the bankruptcy

5     guys thought this was wishful thinking.  But I thought it

6     was worth an effort in that case.  All right.  I think

7     those are most of the things that I wanted to say

8     concerning the matter.

9          Mr. Iley is going to do this time, and he is going

10    to do it as best he can, in a way that is as honorable as

11    he can do it.  And it won't make the victims whole, but I

12    think it will make the victims more comfortable with an

13    appropriate sentence in the case.

14         I am asking the Court to consider Leavenworth as a

15    locale for his sentence.  That is a few hours away, I,

16    think from Wichita, Kansas.  The Court knows that his

17    wife, who is here in court today, and their four children,

18    moved there for a number of different reasons.  Because

19    that is where they reside at the time.  And I am asking

20    the Court consider that as a recommendation, simply as an

21    accommodation to the family.

22         Lastly, Your Honor, I think at the end of the day,

23    I think, again, I know the Court's predilections.  I

24    understand what the Court has said.  But I would

25    respectfully suggest that both the Government, which had

1    access to every factor in the case, every victim in the

2    case, every issue in the case, did recommend a sentence at

3    about, I think, 97 or 98 months.  And they agreed that

4    they would recommend a sentence at the bottom of the

5    guideline.

6          So I think Mr. Larson, he has been honorable, and,

7    once again, as I understand it, recommended a sentence at

8    the bottom of that guideline, because that is what he

9    agreed to do.  And the probation department, with their

10   back and forth about the client and his reticence or his,

11   you know, failure to move quickly enough concerning this

12   couple-week period of time, with all of that, recommended

13   a 110-month sentence.

14         And then the Court commented that we had said,

15   well -- and they said in their findings that the reason

16   they did that is because he was a risk to carry on with

17   this criminal activity, and that extra time would temper

18   that concern, and that is why they recommended a higher

19   range or a higher sentence.

20         And that was when we said to the Court, not asking,

21   again, for departure, not asking for variance, about his

22   age and his family.  And the fact that there is no chance

23   at all with this man -- when he comes out of jail, he is

24   going to be anywhere from 67 to 70.  And that is not

25   necessarily real old, but, he is going nowhere but back to

1    his home a broken man, and wants to do the best he can,

2    to, believe it or not, try to make some effort to either

3    buy, you know, the right lotto ticket, invest in the right

4    app, which is an issue that was involved in the

5    bankruptcy, as well, and make up for a terrible crime.

6        But I think, in the last analysis, that a 10-year

7    sentence is fair.  I think it is within the guidelines

8    that I think are appropriate.  The Court is citing another

9    guideline.  And I think the Government looked at that.

10   The probation department made reference to it.  It wasn't

11   in the plea agreement that we considered as a factor.  In

12   fact, it was discounted.

13       And, at the end of the day, the benefit of the

14   bargain here, whatever you might call it, in a case where

15   somebody comes in says, I did it, and does what he is

16   supposed to do, I think candor in a case like this, and

17   the system suggests to a defendant, under these

18   guidelines.  And so that is what we are asking for the

19   Court to do.

20       I truly appreciate the Court giving us the time,

21   because it gave me a little more time to at least gather

22   my thoughts and indicate to the Court what my feelings

23   were.

24       If I can have just one moment, Judge.

25       THE COURT:  You May.

1          MR. LOZOW:  Your Honor, that is most of the things

2     that I want toed say.  I have look through the notes, and

3     Ive touched on the things.

4          Again, we would ask the Court to impose a sentence,

5     if we are talking about -- we still think that the

6     sentence is reasonable and no more than is necessary by

7     going to the guideline that has guided both the

8     prosecution and the probation department; that is the 97

9     to 121 months.

10          If the Court sees fit -- and I think this is -- I

11     am assuming this is more of a departure than a variance,

12     but however the Court classifies it, it is time, more

13     time.  And I would respectfully suggest that the Court

14     should sentence the defendant to 121 months, which, again,

15     is a 10-year sentence, plus a month.  I think it is more

16     than reasonable.  And I think it is a reasonable sentence,

17     and not more than necessary with regard to this.  And, I

18     think, in the last analysis, it is a sentence, taking into

19     account what the plea agreement involved, is consistent

20     with the plea agreement and consistent with what the

21     guidelines attribute to the wrongdoing in this case.

22          THE COURT:  All right.  Thank you.  Why don't you

23     all have a seat so Mr. Larson can next make any statement

24     he wishes to make, and then I will hear from Mr. Iley.

25          You can go to the podium if you wish, Mr. Larson.

1          MR. LARSON:  Good afternoon, Your Honor, as this

2     Court well knows, there is a plea agreement in this case,

3     and the Government's obligations in the plea agreement

4     remain.  And the Government recommends a sentence

5     consistent with its obligations in the plea agreement,

6     which, as we understand it, is 97 months.

7          With respect to the defendant's most recent filing,

8     it was filed late last night.  We don't have much to say

9     about this.  We were not a party, of course, to the

10    defendant's back and forth with probation.

11         There is a bankruptcy action, which is largely a

12    collateral matter with respect to this case.  And we note

13    that the defendant has attached some of the e-mails that I

14    sent with respect to restitution.

15         I would just note, with respect to restitution,

16    that that was vigorous back and forth.  That there were

17    questions that were asked that we answered.  And we have

18    now stipulated to an amount in restitution, which the

19    Court has ordered as forfeiture.  Beyond that, unless the

20    Court has any questions, we don't have any more to add.

21         THE COURT:  I do have.  Why did the Government not

22    pursue a 2B1.1(b)(2)(B) enhancement?  It seems to me from

23    the statements that I have read that that provision of the

24    United States Sentencing Guidelines is met.

25         MR. LARSON:  Your Honor, I approach this with some

1    trepidation, as I am somewhat uncomfortable talking about

2    the negotiations.

3         THE COURT:  Well, and I don't want you to get into

4    it.  I have no business in the middle of your

5    negotiations.  But, it just seemed to me that there was

6    sufficient evidence that that enhancement could be

7    applied.

8         MR. LARSON:  Your Honor, I think the presentence

9    report, in a footnote, reflects a discussion that the

10   probation office had with the Government.  And the

11   Government is limited to the evidence that was in

12   discovery at the time that there was plea negotiation.

13        THE COURT:  All right.  That was the only question

14   I had.

15        MR. LARSON:  Thank you, Your Honor.

16        THE COURT:  All right.  Mr. Iley, if you and

17   Mr. Lozow would please re-approach the podium.

18        At this time, if you wish to make a statement to me

19   on your own behalf before I impose sentence, this is your

20   opportunity.

21        THE DEFENDANT:  Your Honor, I appreciate you taking

22   the time to listen to my words.  As I spent time kind of

23   contemplating on where I have come in my life based upon

24   the truly bad decisions that I have made, I first and

25   foremost would like to express, though I do not have the

1   words possibly to do so, the depth of my grief and sorrow

2   as to the things I have caused my clients and friends.

3        I truly did consider them friends and did like

4   them.  But I know what I did has hurt them badly.  And, if

5   I could, I would obviously go back and change or just make

6   things not happen, I would do so.  However, I realize that

7   as bad as I might feel, that there is nothing I can do or

8   say at this point that will change things.

9        At this point, I have got to accept what it is.  I

10  have go to deal with what it was.  And I have got to hope

11  for the future and what that might be for me.  So, I do go

12  on the record to say I deeply, deeply apologize to my

13  clients.  And I tell them that I will carry for the rest

14  of my life the grief and remorse I feel for this.

15       Two things I would really like for you to consider,

16  Your Honor.  The first would be the restitution issue.

17  When I am out, I will be able to work and pay toward that

18  restitution.  I know it is a large dollar amount, but when

19  I am out, if opportunities come my way, if I work hard, I

20  can at least make a dent toward that and spend the rest of

21  my life taking care of it.

22       I tell you it is my solemn promise that I, number

23  one, going forward, with live a life of honesty and

24  integrity.  It is just not worth it, and I never want to

25  do this again.  And I certainly never would re-offend.

1        Secondly, it will be my number one goal, for what
2   is left of my life, to pay back that restitution in an
3   honest fashion as quickly as I possibly can.
4        With that said, Your Honor, I will state that as
5   long as I am housed and living on the tax dollar, I have
6   no ability to pay restitution or to work toward that
7   restitution.  So I would ask that, please, if you can give
8   me -- the further out I go, the older I get, the less
9   opportunities I will have for jobs, the less opportunities
10  I will have to build a cash flow that would make a dent
11  and or possibly pay that restitution back.
12       So it would be my goal to pay it back, and I
13  respectfully request that you consider that in terms of
14  sentencing, so that I can get out and get to working on
15  the restitution.
16       The second thing I would respectfully ask that you
17  consider is the self surrender.  Obviously both the Feds,
18  as well as probation, have requested self surrender.  I
19  have to say that I have been to every place and every time
20  that I have been requested to do so.
21       In addition to truly hurting a lot of wonderful
22  people, I have truly, truly hurt the people I love most;
23  my family.  Because of my stupidity and my arrogance and
24  my bad acts, they have been ripped from the only town they
25  really knew.  And I've thrown them into a completely new

1   world, but they have to adjust.

2       I would truly beg and request that you give me self

3   surrender, so that for the few precious days I can be with

4   them, to help them make the transition, to get moved over,

5   to get going forth with the new life that they must brave,

6   in the brave new world that they are at.  And then I will

7   absolutely, positively, whatever the date, time, and place

8   is, I will be there to turn myself in.

9       But, again, just give me a few days so that I can

10  help my family in this transition and help another group

11  of people that I've badly hurt.

12      Thank you for your time, Your Honor.

13      MR. LOZOW:  Judge, can I have one moment with the

14  U.S. Attorney?

15      THE COURT:  You may.

16      MR. LOZOW:  To just reflect, and I am not trying to

17  go over everything again, but I do think that the

18  Government's recommendation of a sentence at the

19  bottom-of-the-guideline range, if the Court is coming to

20  the 32, means that the recommendation would be consistent

21  with 121 months rather than 97 months.  To me, that is

22  consistent with our agreement.

23      THE COURT:  All right.  As a result of the United

24  States Supreme Court's rulings in United States v. Booker

25  and United States v. Fanfan, the United States Sentencing

1    Commission Guidelines have become advisory to this Court.

2          Although this Court is not bound to apply those

3    guidelines, it has consulted them and taken them into

4    account, along with the sentencing factors set forth at 18

5    United States Code Section 3553(a).

6          The Court finds that the 2-level enhancement,

7    pursuant to United States Sentencing Guideline Section

8    2B1.1(b)(9)(C) does apply.

9          The Court determines that no finding is necessary

10    concerning the remaining objections to the presentence

11    report, because those controverted matters will not be

12    taken into account in imposing sentence, nor will they

13    affect the sentence that the Court imposes.

14          Neither the Government nor the defendant has

15    challenged any other aspects of the presentence report.

16    Therefore, the remaining factual statements and guideline

17    applications are adopted without objection as the Court's

18    findings of fact concerning sentencing.

19          The Court finds that total offense level is 30.

20    The defendant's Criminal History Category is a I.  That

21    results in an advisory imprisonment range of 97 to 121

22    months, a fine range of $15,000 to $150,000, and the

23    supervised release range is not more than 3 years.

24          For the reasons previously stated by the Court, the

25    Court finds that an upward variance from the advisory

1    guideline range is merited in this case.

2          Pursuant to the Sentencing Reform Act of 1984, it

3    is the Judgment of the Court that the defendant, Donald

4    Iley, is hereby committed to the custody of the Bureau of

5    Prisons to be imprisoned for a term of 151 months as to

6    Count 12, and a term of 36 months as to Count 28, to run

7    consecutively -- I am sorry, concurrently to one another.

8          Upon release from imprisonment, the defendant shall

9    be placed on supervised release for a term of 3 years as

10   to Count 12, and a term of 1 year as to Count 28, also to

11   run concurrently to one another.

12         Within 72 hours of release from the custody of the

13   Bureau of Prisons, the defendant shall report in person to

14   the probation office in the district to which he is

15   released.

16         While on supervised release, the defendant shall

17   not commit another federal, state or local crime; shall

18   not possess a firearm, as defined in 18 United States Code

19   Section 921; and shall comply with the standard conditions

20   that have been adopted by the Court in General Order

21   2016-1.

22         The defendant shall not unlawfully possess a

23   controlled substance.  He shall refrain from any unlawful

24   use of a controlled substance.

25         He shall submit to one drug test within 15 days of

1    release on supervised release, and two periodic tests

2    thereafter.  He shall also cooperate in the collection of

3    DNA, as directed by the probation officer.

4         The Court finds that the following conditions of

5    supervision are reasonably related to the factors set

6    forth at 18 United States Code Sections 3553(a) and

7    3583(d).

8         Further, based on the nature and circumstances of

9    this offense and the history and characteristics of this

10   particular defendant, these conditions do not constitute a

11   greater deprivation of liberty than reasonably necessary

12   to accomplish the goals of sentencing.

13        First, the defendant shall make restitution in the

14   total amount of $9,718,327.68 to the victims and in the

15   amounts indicated in the presentence report.  Restitution

16   is ordered to be directed to the addresses provided to the

17   Clerk of the Court by the probation officer.

18        The Court has determined that the defendant does

19   not have the ability to pay interest, and it is ordered

20   that the interest requirement is waived for the

21   restitution.

22        Second, the defendant shall not incur new credit

23   charges, open additional lines of credit, or obtain or

24   enter into any financing agreement or arrangements without

25   the approval of the probation officer, unless he is in

1   compliance with the periodic payment obligations imposed

2   pursuant to this Court's judgment and sentence.

3          Third, as directed by the probation officer, the

4   defendant shall apply any moneys received from income tax

5   refunds, lottery winnings, inheritances, judgments, and

6   any anticipated or unexpected financial gains to the

7   outstanding court-ordered financial obligations in this

8   case.

9          Fourth, the defendant shall make payment on the

10  financial or restitution obligations that remain unpaid at

11  the commencement of supervised release.  He shall provide

12  to the probation officer access to any requested financial

13  information, and authorize the release of any financial

14  information until all financial obligations imposed by the

15  Court are paid in full.

16         Within 60 days of release from confinement, he

17  shall meet with the probation officer to develop a plan

18  for the payment of the restitution.  He shall work with

19  the probation office in development of a monthly budget

20  that shall be reviewed with the probation officer

21  quarterly.

22         He shall document all income, compensation, and

23  financial support generated or received from any source,

24  and provide such information to the probation officer as

25  requested.

1         The plan of payment will be based upon the

2    defendant's income and expenses, with the restitution

3    amount to be paid in monthly installment payments.  Such

4    monthly installment payments shall be at least 10 percent

5    of the defendant's gross monthly income.  Because this

6    sentence imposes restitution, it is a condition of

7    supervision that he pay in accordance with this order.

8         Fifth, all employment must be approved in advance

9    by the probation officer.  And the defendant shall not

10   engage in any business activity unless it is approved by

11   the probation officer.  All approved business activity

12   must operate under a formal registered entity.  And the

13   defendant shall provide the probation officer with the

14   business entities and their registered agents.

15        The defendant shall maintain business records for

16   any approved business activity, and shall provide all

17   documentation and records as requested by the probation

18   officer.

19        Six, the defendant shall maintain separate personal

20   and business finances, and shall not commingle personal

21   and business funds or income in any financial accounts,

22   including, but not limited to, bank accounts and lines of

23   credit.

24        Seven, the defendant may not cause or induce anyone

25   to conduct any financial transaction on his behalf or

1    maintain funds on his behalf.

2            Eight, the defendant must not engage in an

3    occupation, business, profession, or volunteer activity

4    that would require or enable him to be an accountant

5    without the prior approval of the probation officer.

6            If the defendant has an outstanding financial

7    obligation, the probation officer may share any financial

8    or employment documentation relevant to the defendant with

9    the Asset Recovery Division of the United States

10   Attorney's Office to assist in the collection of the

11   obligation.

12           Finally, the defendant -- well, not finally, I

13   guess.  The defendant shall comply with all legal

14   obligations associated with the Colorado Department of

15   Revenue and the Internal Revenue Service regarding federal

16   and state income taxes.  This includes resolution of any

17   tax arrearages, as well as continued compliance with

18   federal and state laws regarding the filing of taxes.

19           He must also comply with any orders pertaining to

20   the pending bankruptcy proceeding.

21           Disbursement of any restitution payment shall be

22   made on a pro rata basis to the victims.  Any

23   disbursements returned to the Clerk of the Court as

24   unclaimed or undeliverable shall be deposited into the

25   Court registry and disbursed to the remaining victims on a

1    pro rata basis.

2        He shall pay a special assessment of $200.  The

3    Court finds that he does not have the ability to pay a

4    fine, so the Court will waive the fine in this case.

5        It is ordered that the payment of the special

6    assessment and restitution obligation shall be due

7    immediately.  Any unpaid restitution balance upon release

8    from incarceration shall be paid in monthly installment

9    payments during the term of supervised release, as

10   previously outlined by this Court.

11       There is a forfeiture order that you need; is that

12   correct?

13       MR. LARSON:  Yes, Your Honor.  I believe we entered

14   it.

15       THE COURT:  All right.  So I don't need to make an

16   oral ruling at this point?

17       MR. LARSON:  You do need for make an oral note of

18   it.

19       THE COURT:  All right.  Pursuant to Rule 32.2 of

20   the Federal Rule of Criminal Procedure, and the

21   defendant's admission to the forfeiture allegation

22   contained in the Indictment, the defendant must forfeit to

23   the United States any and all property, real or personal,

24   derived from proceeds from the instant offense, or to be

25   liable for a money judgment in the amount of the proceeds

1    that he obtained as a result of the fraudulent scheme.

2            The Court will make the recommendation that the

3    Bureau of Prisons attempt to designate Mr. Iley to

4    Leavenworth.  That is just a recommendation.  I have no

5    authority over the Bureau of Prisons, so they will do as

6    they see fit.

7            Now, Mr. Iley, I do want you -- and your wife is

8    here somewhere, and the rest of those folks that are here

9    today, I want you all to understand that I do take my task

10   of sentencing very seriously.  And it is the hardest thing

11   I have to do.  I lose sleep of over trying to determine

12   what is a sufficient, but not greater than necessary,

13   sentence for each crime that is brought before me.

14           And I take it seriously, because on the one hand, I

15   know that I have your life, or at least part of it in my

16   hands, and I want to be fair to you.  By I also have an

17   obligation to the public and to society to protect them

18   from further crimes, to promote respect for the law, to

19   provide a just punishment, but one that is going to deter

20   you and others from committing similar criminal conduct.

21           Now, in this case, in your allocution, you stated

22   to me that you wanted to pay back the restitution.  I

23   can't tell you how many defendants I have standing in your

24   shoes that want me to go light on them because they want

25   to get out there and work and pay it back, but they have

1    done absolutely nothing prior to sentencing to try to pay

2    back any of the money that they took.

3         And I didn't see any of that from you.  I saw no

4    effort.  And what I read in there was an effort to pay off

5    your house; $900,000, so you would have more equity.  But

6    I really did not see any significant effort to pay back

7    what you took from these folks.

8         So, I can't take an offer like that seriously.  And

9    the cases from other courts that have transferred in, for

10   instance, California, where that was exactly what the

11   defendant promised, he was given a slap on the wrist.  And

12   I had to send him back to prison because he wouldn't

13   comply.  He wouldn't provide probation with any of the

14   financial documents, and made no effort whatsoever to

15   repay anything, but got a slap on the wrist, because that

16   is what he promised to do.

17        So I don't take those kind of entreaties to me very

18   seriously.  Because until I see some conduct that will

19   back that up, it is just words.

20        In this case, I do believe that a sentence lower

21   than I had originally anticipated, in part because of

22   Mr. Lozow's argument on your behalf, I believe a sentence

23   of 151 months on Count 12, and 36 months on Count 28, to

24   run concurrently, with the supervised release and the

25   terms that I have imposed, is a sentence that reflects the

1    seriousness of this offense, and is a sufficient, but not

2    greater than necessary, sentence to achieve the objectives

3    of sentencing.

4         Now, Mr. Iley, I have sentenced you above the

5    guideline range that you agreed to waive your rights to,

6    so you have the right to appeal this sentence.  If you

7    desire to appeal, a Notice of Appeal must be filed with

8    the Clerk of the Court within 14 days after entry of

9    Judgment or your right to appeal will be lost.

10        If you are not able to afford an attorney for an

11   appeal, one will be appointed to represent you.  And if

12   you request, the Clerk of the Court must immediately

13   prepare and file a Notice of Appeal on your behalf.

14        The Government's motion, Document No. 30, to

15   dismiss the remaining counts as to this defendant, is

16   granted.

17        The last issue is whether I should remand Mr. Iley

18   or allow him to self surrender.  I have heard nothing that

19   would persuade me by clear and convincing evidence that he

20   is not likely to flee.  And, therefore, I am going to

21   remand Mr. Iley to the custody of the United States

22   Marshal, until delivered to the custody of the Bureau of

23   Prisons.

24        Anything further?

25        MR. LARSON:  Nothing from the Government, Your

1    Honor.

2          MR. LOZOW:  We have nothing Your Honor.

3          THE COURT:  Thank you very much.

4          Court will be in recess.

5          (Proceedings conclude at 4:03 p.m.)

6

7          **R E P O R T E R ' S   C E R T I F I C A T E**

8

9          I, Darlene M. Martinez, Official Certified

10   Shorthand Reporter for the United States District Court,

11   District of Colorado, do hereby certify that the foregoing

12   is a true and accurate transcript of the proceedings had

13   as taken stenographically by me at the time and place

14   aforementioned.

15

16         Dated this 20th day of October, 2017.

17

18         _____

19         s/Darlene M. Martinez

20         RMR, CRR

21

22

23

24

25