**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 4, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

          Plaintiff - Appellee,

v.                                                                    No. 17-1269

DONALD ILEY,

          Defendant-Appellant.

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:16-CR-00284-CMA-1)**

---

Josh Lee, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Denver, Colorado, for Defendant-Appellant.

Karl L. Schock, Assistant United States Attorney (Robert C. Troyer, United States Attorney, with him on the brief), Office of the United States Attorney, Denver, Colorado, for Plaintiff-Appellee.

---

Before **LUCERO**, **HARTZ**, and **HOLMES**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

For crimes of fraud and deceit, § 2B1.1(b)(9)(C) of the U.S. Sentencing Guidelines Manual ("U.S.S.G." or "Guidelines") provides for a two-level sentencing enhancement if the defendant's offense conduct violated "any prior, specific judicial or administrative order." After investigating complaints regarding the tax-preparation services of the defendant, Donald Iley, the Colorado Board of Accountancy (the "Board") issued an administrative order—called an "Agreement and Final Agency Order" (the "Order"), R., Vol. I, at 78 (Agreement and Final Agency Order, dated Jan. 29, 2010)—in which Mr. Iley admitted to engaging in professionally negligent conduct and agreed to accept certain disciplinary sanctions, including a $10,000 fine and a five-year probationary period. Among the acts for which the Board disciplined Mr. Iley was taking a client's money ostensibly to pay the client's payroll taxes but then failing to promptly and properly pay those funds to the Internal Revenue Service ("IRS"). During his probationary period, Mr. Iley was required to open his practice to monitoring by a third-party accountant, to complete eighty hours of continuing professional education within two years of the Order's effective date, and to submit quarterly reports to the Board in which Mr. Iley was obliged to attest to his continued compliance with the Order's terms.

However, while serving the Order's probationary term, Mr. Iley executed a fraudulent scheme in which he fleeced his clients of more than $11 million. As part of this scheme, Mr. Iley fraudulently misrepresented to his clients that he was

2

taking their funds to pay outstanding payroll taxes to the IRS but, instead, Mr. Iley used those funds for personal purposes. After this fraud was discovered, Mr. Iley pleaded guilty to wire fraud and aiding in the preparation of a false tax return. At sentencing, the district court enhanced Mr. Iley's sentence under § 2B1.1(b)(9)(C). The question before us is whether the court erred in doing so. We hold that, under the particular circumstances of this case, the court did not err. Accordingly, exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we **affirm**.

## I

Donald Iley was an accountant. Until 2015, he was licensed by the Board and owned and operated an accounting firm, Iley & Associates, Inc. Among other services, Mr. Iley calculated clients' payroll taxes, prepared the necessary tax forms, collected money from clients to pay these taxes, and then sent the money and the accompanying forms to the IRS.

Not all of Mr. Iley's clients were satisfied with his services. After receiving multiple complaints about his tax-preparation practices, the Board launched an investigation. Mr. Iley had notice of the investigation, and he responded to the allegations made against him. After conducting meetings on the matter, the Board "found reasonable grounds to refer [Mr. Iley and his business] to [a] hearing for license law violations." R., Vol. I, at 79. However, in 2010,

Mr. Iley and the Board ultimately reached an agreement to resolve the matter. Their agreement was memorialized in the aforementioned Order.

In that Order, Mr. Iley admitted to certain acts of professional negligence, gave up his right to a hearing regarding the complaints, and agreed to the Board's imposition of certain discipline. Among other things, Mr. Iley admitted in the Order that he took a client's money ostensibly to pay that client's payroll taxes to the IRS but "failed to properly and promptly remit payment in full to the IRS." *Id.* at 88. As for the discipline, the Board sanctioned Mr. Iley by requiring him to pay a fine of $10,000 and to submit to a five-year period of probation. During this probationary period, Mr. Iley was obliged to open his practice to monitoring by a third-party accountant to "improve the quality and accuracy of [his] tax services and to determine whether [Mr. Iley] meets the generally accepted professional standards for tax services," including adherence to the Board's ethical rules. *Id.* at 93. Mr. Iley also was required to complete eighty hours of continuing professional education within two years of the Order's effective date. And, lastly, Mr. Iley was required to submit quarterly reports to the Board attesting to his "compliance with this Order." *Id.* at 95. The Order expressly warned Mr. Iley that "[a]ny violation of this Order may result in grounds for discipline." *Id.* at 98.

However, for a year before the Board issued the Order and for approximately five years afterwards, Mr. Iley was engaged in a fraudulent scheme

4

to steal money from his clients.  As part of this scheme, Mr. Iley would prepare an accurate form reflecting the payroll taxes a client owed, submit the form for the client's approval, and then withdraw money from the client's accounts under the guise of paying the tax.  But Mr. Iley would not send the money to the IRS; instead, he would keep the money for his own personal purposes—including making "payments on his mortgage and his wife's credit card bill."  *Id.* at 7 (Indictment, filed Aug. 24, 2016).  To complete the scheme, Mr. Iley would send the IRS a phony form, wrongly showing that the client owed no payroll taxes. There is no indication in the record that the Board was aware of the fraudulent nature of Mr. Iley's misdeeds when it issued the Order in 2010.

As authorized by the Order, Mr. Iley requested early termination of the practice monitoring in 2013.  As support for his request, Mr. Iley represented to the Board that he had "learned a great deal from this process, including" the need for "absolute candor with clients."  *Id.* at 25 n.3 (Plea Agreement, filed Apr. 18, 2017).  But his actions revealed that Mr. Iley was not being truthful with the Board.  Yet, oblivious to Mr. Iley's ongoing fraud, the Board granted Mr. Iley's request.  However, the Board later became aware that Mr. Iley (among other things) was still "failing to remit taxes on behalf of clients to the United States Treasury," and it suspended his license in December 2015 and "permanently revoked" it in August 2016.  *Id.*, Vol. II, ¶ 36 (Presentence Investigation Report ("PSR"), filed July 7, 2017).

In late 2015, with some of Mr. Iley's clients now wise to his fraudulent

conduct and law enforcement directing their investigative resources at him, Mr.

Iley ended his fraudulent scheme. All told, Mr. Iley defrauded his clients of more

than $11 million. More than 140 of his clients were identified as victims of the

scheme. Many of them ended up owing the IRS interest and penalties because

Mr. Iley failed to honor his promises to forward their funds to the IRS to pay their

payroll-tax liabilities. And some of his clients were small businesses that were

"ruin[ed]" "financially" by his fraudulent scheme. *Id.*, Vol. V, at 75 (Tr. of

Sentencing Hr'g, dated July 13, 2017).

In August 2016, a federal grand jury returned an indictment against Mr.

Iley charging him with twelve counts of wire fraud, 18 U.S.C. § 1343, two counts

of mail fraud, 18 U.S.C. § 1341, and eighteen counts of aiding in the preparation

of false tax returns, 26 U.S.C. § 7206(2). Some months later, Mr. Iley pleaded

guilty to one count of wire fraud and one count of aiding in the preparation of a

false tax return, in exchange for the government agreeing, *inter alia*, to dismiss

the remaining charges.

The U.S. Probation Office prepared a PSR and computed Mr. Iley's

advisory Guidelines sentencing range as ninety-seven to 121 months'

imprisonment.[1] The PSR arrived at that range by using a total adjusted offense

---

[1]    The Probation Office used the 2016 edition of the Guidelines in
(continued...)

level of thirty, which included a two-level enhancement under § 2B1.1(b)(9)(C) for Mr. Iley's alleged violation of the Order.  Without this "Prior Order" enhancement,[2] Mr. Iley would have faced an advisory Guidelines sentencing range of seventy-eight to ninety-seven months' imprisonment.

Mr. Iley objected to the PSR's application of the § 2B1.1(b)(9)(C) enhancement.  As he saw it, his fraud conviction was unrelated to the conduct for which the Order had punished him—namely, professional negligence.  Thus, as Mr. Iley reasoned, his later fraud did not violate the Order, meaning that § 2B1.1(b)(9)(C) did not apply.

---

[1](...continued)
calculating Mr. Iley's sentence.  This decision is not challenged on appeal. Therefore, in resolving this appeal, we also rely on the 2016 edition.

[2]    From 2004 to 2010, the language currently found in § 2B1.1(b)(9)(C) appeared in § 2B1.1(b)(8)(C).  From 2001 to 2003, this language was housed in § 2B1.1(b)(7)(C).  Before that, the enhancement was governed by somewhat different language (although, as we discuss *infra*, the differences are immaterial in this case) and appeared elsewhere in the Guidelines.  *See United States v. Pentrack*, 428 F.3d 986, 989 (10th Cir. 2005) (citing U.S.S.G. § 2F1.1(b)(4)(B) (Nov. 1999)).  Because the language has not changed in respects material to this case with these re-codifications, we consider judicial decisions interpreting prior versions of the enhancement as directly applicable to our resolution of Mr. Iley's challenge under § 2B1.1(b)(9)(C).  Moreover, to minimize any possible confusion related to these immaterial changes, this opinion generally elides in its analysis the prior section numbers and (except where necessary) changes in the enhancement's text.  Not infrequently, it simply refers to the enhancement as the "Prior Order" enhancement, without reference to which version of the enhancement was effective at the time of a particular judicial decision.

The Probation Office saw things differently. It noted that the Order put Mr. Iley on probation and part of that probation entailed "not engaging in more fraudulent activity." R., Vol. II, at 226 (Addendum to the PSR, dated July 7, 2017). Yet, as the Probation Office explained, Mr. Iley "continued his fraudulent activity." *Id.* And so the Probation Office reasoned that Mr. Iley had violated the Order and was thus eligible for the § 2B1.1(b)(9)(C) enhancement.

At sentencing, the district court agreed with the Probation Office. It read the Order as telling "Mr. Iley that he needed to stop engaging in . . . . further fraudulent activity." *Id.*, Vol. V, at 49–50. The court stated that, despite that warning, Mr. Iley was "actively defrauding" his clients while on probation and thereby violating the Order. *Id.* at 49. For that reason, the court found that the § 2B1.1(b)(9)(C) enhancement applied to Mr. Iley.

Mr. Iley now appeals, challenging the district court's imposition of the two-level enhancement under § 2B1.1(b)(9)(C).

## II

The overarching question of whether a district court correctly computed a defendant's Guidelines sentencing range—and, more specifically, whether it correctly imposed a particular Guidelines enhancement—is a question of procedural reasonableness. *See, e.g.*, *United States v. Huckins*, 529 F.3d 1312, 1317 (10th Cir. 2008) (noting that "[p]rocedural reasonableness addresses [*inter alia*] whether the district court incorrectly calculated . . . the Guidelines

8

sentence"); *accord United States v. Martinez-Barragan*, 545 F.3d 894, 898 (10th Cir. 2008).  However, in assessing whether the district court's computation is correct "we review legal questions regarding the application of the Sentencing Guidelines de novo," and "a district court's factual findings are reviewed only for clear error, giving due deference to the district court's application of the Guidelines to the facts."  *United States v. Pentrack*, 428 F.3d 986, 989 (10th Cir. 2005); *see also United States v. Kristl*, 437 F.3d 1050, 1054 (10th Cir. 2006) (per curiam) ("We note that this new standard of review—that of 'reasonableness'—does not displace the oft-cited principle that in considering the district court's application of the Guidelines, we review factual findings for clear error and legal determinations de novo.").

We do not appear to have addressed in direct and express terms whether we should assess de novo whether a particular "prior, specific judicial or administrative order, injunction, decree, or process" provides a sufficient basis for the imposition of the Prior Order enhancement.[3]  U.S.S.G. § 2B1.1(b)(9)(C).

---

[3]    In two precedential decisions, we appear to have tacitly conducted such an assessment de novo.  We seemingly did so in *Pentrack* when "[t]urning to the factual background" of that case—that is, when focusing on whether the message conveyed by the "consent judgment and stipulation" at issue was adequately specific regarding "the type of conduct prohibited."  428 F.3d at 988, 990.  In this connection, it is notable that in *Pentrack* we did not purport to defer in any way to the district court's interpretation of the judgment and stipulation; we simply concluded based on an independent analysis that it "was designed to prohibit prior misconduct of the very same nature as his federal crimes" and

(continued...)

And, as it turns out, we need not definitively resolve this standard-of-review

question here.  That is because the parties present no genuine controversy

regarding it.  *See, e.g.*, *People for the Ethical Treatment of Property Owners v.*

*U.S. Fish and Wildlife Serv.*, 852 F.3d 990, 1008 (10th Cir. 2017) ("[I]f it is not

necessary to decide more, it is necessary not to decide more."  (alteration in

original) (quoting *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004)

(Roberts, J., concurring in part and concurring in the judgment))), *cert. denied*,

138 S. Ct. 649 (2018); *Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*,

---

[3](...continued)
offered "specific notice as to prohibited conduct."  *Id.* at 990–91.  With less
exposition, we appear to have followed a similar path in *United States v.*
*Flanders*, 491 F.3d 1197 (10th Cir. 2007).  There, we arguably reviewed a prior
administrative order de novo in addressing "[t]he extent to which the [order]
restricted Defendant's [subsequent] conduct" regarding certain matters discussed
in the order.  *Id.* at 1219.  So interpreted, our prior precedent would be congruent
with at least some of our sister circuits that have directly and expressly addressed
this question.  *See United States v. Nash*, 729 F.3d 400, 403 (5th Cir. 2013) ("A
determination that a particular judicial or administrative action qualifies under
Section 2B1.1(b)(9)(C) is an interpretation and application of the guidelines that
we review de novo."); *United States v. Mantas*, 274 F.3d 1127, 1132 (7th Cir.
2001) ("We review *de novo* the district court's imposition of a 2–offense–level
sentence enhancement for violation of official process under [the Prior Order
enhancement]."). And application of a de novo standard of review also would
seemingly be consistent with the approach generally taken in reviewing similar
written instruments in other contexts.  *See Joseph A. ex rel. Wolfe v. Ingram*, 275
F.3d 1253, 1266 (10th Cir. 2002) ("We construe the terms of a consent decree de
novo using traditional principles of contract interpretation."); *see also Schering*
*Corp. v. Ill. Antibiotics Co.*, 62 F.3d 903, 908 (7th Cir. 1995) ("The interpretation
of documents, including judicial decrees, is . . . traditionally an issue of law and
one on which, moreover, appellate review is plenary.").  However, as noted *infra*,
we ultimately exercise restraint and leave the definitive resolution of this
standard-of-review issue to another day.

616 F.3d 1086, 1094 (10th Cir. 2010) ("Judicial restraint, after all, usually means answering only the questions we must, not those we can."). Specifically, the parties agree that de novo review governs this question. *Compare* Aplt.'s Opening Br. at 8 (asserting, without citation to controlling Tenth Circuit authority, that "[d]e novo review also governs the district court's interpretation of the administrative order that Mr. Iley allegedly violated"), *with* Aplee.'s Resp. Br. at 7 (adopting the de novo approach of the Fifth Circuit). Thus, we are content to apply de novo review in assessing whether the Order provides a sufficient basis for the imposition of the Prior Order enhancement.

## III

This case turns on whether Mr. Iley's fraudulent conduct violated the Order.[4] Mr. Iley claims that it did not for two reasons. First, in his view, § 2B1.1(b)(9)(C) applies only when a defendant does something that an "agency had expressly forbidden him from [doing]." Aplt.'s Opening Br. at 7. And because the Order did not expressly enjoin Mr. Iley from committing the same or similar fraudulent conduct for which he ultimately was convicted, Mr. Iley contends that he did not violate the Order. *See id.* at 6 ("[T]he administrative order clearly delineates the conditions of Mr. Iley's probation, and none of those conditions includes an order not to commit fraud."). Second, Mr. Iley argues that

---

[4]    The parties do not contest that the Order qualifies as a prior "administrative order" under § 2B1.1(b)(9)(C).

the Order punished him for negligence, not fraud.  Hence, Mr. Iley reasons that

his fraudulent conduct did not violate the Order because negligence and fraud are

different.  For either or both reasons, he contends that the district court erred in

applying the § 2B1.1(b)(9)(C) enhancement.[5]

---

[5]     Some of our sister circuits have held in the context of administrative orders that "imposing the two-level [Prior Order] enhancement requires an interaction between the agency and defendant that allowed the defendant to participate in some meaningful way (if he elected to do so)."  *United States v. Goldberg*, 538 F.3d 280, 291 (3d Cir. 2008); *see Nash*, 729 F.3d at 405 ("[T]he district court correctly found that Nash's prior violation of [the government program at issue] and his acknowledgment of the violation satisfied the requirement that there be 'interaction' between the agency and the defendant." (quoting *Goldberg*, 538 F.3d at 291–92 & n.7)); *see also United States v. Linville*, 10 F.3d 630, 632 (9th Cir. 1993) ("The Commentary and Background to [the Prior Order enhancement] indicate that it was meant to apply where a defendant violated a previously-issued judicial or administrative order which resulted from a formal adversary proceeding; Linville neither had the benefit of an adversary proceeding to establish the statutory violations she is accused of in the [government agency's] warnings, nor was she issued a formal order compelling statutory compliance."); Thomas W. Hutchison, et al., FEDERAL SENTENCING LAW & PRACTICE § 2B1.1, Westlaw (database updated Jan. 2019) ("Because administrative agency procedures are less formal than judicial procedures, the circuits consider the process of the issuance of what is said to constitute an administrative order when determining the applicability of the enhancement.").

We do not appear to have addressed in a precedential decision whether the application of the Prior Order enhancement hinges to any degree on a so-called "interaction" requirement.  And we have no occasion to opine on the matter here because Mr. Iley does not attack the district court's imposition of the enhancement on the ground that the Board's Order was not the product of sufficient "interaction."  Perhaps this is not surprising because the Order—by its plain terms—evinces that Mr. Iley was "notified" of the complaints against him; was "given the opportunity to provide the Board with written data, views, and arguments concerning the complaints"; and negotiated an agreement with the Board, memorialized in the Order, "[i]n order to avoid the uncertainty of

(continued...)

The government disagrees. It says that Mr. Iley's first argument "elevates form over substance." Aplee.'s Resp. Br. at 11. In the government's view, "[a]lthough the Order did not explicitly enjoin [Mr.] Iley from" committing the fraudulent conduct underlying his conviction, "that was the unmistakable implication of the Order." *Id.* at 10. Thus, the government reasons that, by engaging in fraudulent conduct while the Order was in effect, Mr. Iley violated the Order. As for Mr. Iley's second argument, the government asserts that it is irrelevant that the Order disciplined Mr. Iley for negligent conduct, whereas he was subsequently convicted of fraudulent acts, because "by punishing even negligent conduct, the Order necessarily prohibited [Mr.] Iley from engaging in the same conduct fraudulently as well." *Id.* at 14. Thus, the government argues that the district court properly applied the § 2B1.1(b)(9)(C) enhancement.

In sum, the parties disagree on two points. First, whether § 2B1.1(b)(9)(C) applies even though the Order did not expressly enjoin Mr. Iley from committing the same or similar fraudulent conduct for which he ultimately was convicted. And, second, whether the fact that the Order imposed discipline on Mr. Iley for negligent conduct meant that Mr. Iley's subsequent commission of the same or similar conduct fraudulently was not in contravention of the Order.

---

[5](...continued)
litigation and to bring this matter to a conclusion." R., Vol. I, at 79. Indeed, Mr. Iley asserts that the Order "was effectively a consent decree." Aplt.'s Opening Br. at 8.

## A

As to the first question, having carefully considered our caselaw, the plain terms of § 2B1.1(b)(9)(C) and its commentary, and relevant authorities of our sister circuits, we conclude that, at least under the specific circumstances of this case, § 2B1.1(b)(9)(C) applies even though the Order did not expressly enjoin Mr. Iley from defrauding his clients.  In particular, we conclude that § 2B1.1(b)(9)(C) may apply without an explicit injunction when, as here, the prior order (1) imposed a concrete punishment, such as a fine, on the defendant for the same or similar conduct at issue in the defendant's subsequent offense; (2) imposed prospective, remedial conditions or obligations, like practice monitoring and the filing of quarterly reports—through a probationary term or otherwise—that were reasonably calculated to curtail future instances of the conduct at issue; and (3) nevertheless the defendant perpetrated that prohibited conduct while the order was still in effect.

Importantly, we find persuasive support for our holding in our own precedent, specifically *Pentrack*.  There, Mr. Pentrack and a state agency entered into a consent order.  The order punished Mr. Pentrack for deceiving customers and enjoined him from, *inter alia*, making future "false, deceptive, or misleading statements."  428 F.3d at 988.  Some years later, Mr. Pentrack was convicted of defrauding customers.  After the district court enhanced his sentence under the

Prior Order enhancement, Mr. Pentrack argued on appeal that the earlier order was not "specific" enough because "it merely obligated him to do what he had always been required to do, namely obey the law." *Id.* at 989.

In rejecting that argument, we undertook an informative examination of the history of the enhancement and its commentary.[6] We did so because, though the enhancement requires the violation to be of a "specific" injunction—and in legal parlance that would mean the order "must be explicit"—the Prior Order enhancement's plain terms offered "little insight into exactly how the injunction must satisfy" the explicitness standard. *Id.* We noted that the Sentencing Commission inserted in 2000 the "prior, specific" language into what is in material respects the current text of the Guideline,[7] but notably we did not conclude that the Commission did so to create a heightened standard of specificity for injunctions falling within the ambit of the enhancement. In other words, we

---

[6]    *Pentrack* expressly recognized that "[w]e interpret the Sentencing Guidelines by following ordinary rules of statutory construction." 428 F.3d at 989. Further, it is well settled that the commentary of the Guidelines is "binding and authoritative" unless it "violates the Constitution or a federal statute" or adopts "a plainly erroneous reading of[] [a] guideline." *United States v. Miller*, 868 F.3d 1182, 1188 (10th Cir. 2017) (quoting *United States v. Morris*, 562 F.3d 1131, 1135 (10th Cir. 2009)), *cert. denied*, 138 S. Ct. 2622 (2018). We adhere to these principles throughout our analysis here.

[7]    As we stated, "Before 2000, a defendant's offense level was enhanced if [the offense] involved a 'violation of any judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines.'" *Pentrack*, 428 F.3d at 989 (quoting U.S.S.G. § 2F1.1(b)(4)(B) (Nov. 1999)).

did not conclude that the Commission sought to ensure, by its word changes, that defendants would be subject to the enhancement only for violating express commands not to engage in certain conduct.  *See id.* at 990.

Instead, examining the Commission's explanation for the insertion of the language, we noted the following: "The additional phrasing, then, merely clarifies the distinction between enhancements for bankruptcy and non-bankruptcy fraud, effectively leaving *unaltered* the application of the enhancement in non-bankruptcy proceedings." *Id.* (emphasis added).  Under this unaltered application, the prior injunction need not have explicitly proscribed a defendant's subsequent offense conduct; rather, for purposes of the enhancement's application, we concluded that the injunction was sufficient, so long as it was "specific enough to provide the defendant with adequate notice of the prohibited conduct." *Id.*

We concluded that the order in *Pentrack* did just that.  More specifically, "the order was designed to prohibit prior misconduct of the very same nature as [the defendant's] federal crimes (deception of consumers) and gives specific notice as to prohibited conduct"; therefore, we concluded that the order "satisfie[d] the requirements" of the Prior Order enhancement.  *Id.* at 990–91. Given the adequate notice provided by the order, we thought Mr. Pentrack could "hardly complain that he did not know what past conduct was being enjoined or

16

what future conduct would violate [the order's] terms." *Id.* at 991 n.3. For those reasons, we held that the district court did not err in enhancing Mr. Pentrack's sentence.

*Pentrack* suggests that an express injunction is not always necessary under § 2B1.1(b)(9)(C). *Pentrack*'s analysis of the enhancement's history and the Sentencing Commission's insertion of the phrase "prior, specific" indicates that those words were not aimed at creating a heightened standard of specificity for injunctions properly falling within the ambit of the enhancement. That is, the Commission was not seeking to ensure that defendants would be subject to the enhancement only if they violated express commands not to engage in certain conduct. Rather, we concluded that it is sufficient "if the injunction is specific enough to provide the defendant with adequate notice of the prohibited conduct." *Id.* at 990.

It is noteworthy, moreover, that in determining that the order was indeed specific enough in *Pentrack*, we did not parse its terms but rather focused on whether, overall, "the order was designed to prohibit prior misconduct of the very same nature as [Mr. Pentrack's] federal crimes," and whether the order "provide[d] [him] with adequate notice of the prohibited conduct"—that is, of "what future conduct would violate [the order's] terms." *Id.* at 990–991 & n.3. Viewed in totality, *Pentrack*'s reasoning thus strongly suggests that a prior order

17

that was reasonably calculated to prohibit certain conduct need not include terms that expressly enjoin the future occurrence of that conduct. Rather, it is sufficient if that order gave the defendant adequate notice of the prohibited conduct and, in the words of the Guidelines commentary, the defendant's subsequent offense conduct is "the same or similar" as the conduct that the order prohibited. U.S.S.G. § 2B1.1(b)(9)(C) cmt. background; *see Pentrack*, 428 F.3d at 990–991.

Viewed in this light, *Pentrack* points toward our ultimate conclusion that the district court did not err in applying § 2B1.1(b)(9)(C) to Mr. Iley, even though the Order lacked an explicit injunction against the commission of the fraudulent acts that were the subject of Mr. Iley's subsequent offense. As in *Pentrack*, the Order was reasonably calculated to prohibit conduct that was the same as or similar to Mr. Iley's subsequent offense conduct. Recall that the Order specifically identified the conduct: "Despite taking possession of sufficient funds to pay the taxes due, Respondent Iley failed to properly and promptly remit payment in full to the IRS . . . ." R., Vol. I, at 88. Subsequently, Mr. Iley was indicted, *inter alia*, for similar conduct, i.e., taking client funds that were made available to pay taxes, failing to remit those funds to the IRS, and instead "us[ing] these monies for other purposes, including paying personal expenses such as payments on his mortgage and his wife's credit card bill." *Id.* at 7. To prohibit

this conduct, the Order imposed on Mr. Iley a substantial fine of $10,000 and a probationary term during which he was required to abide by certain conditions.

Notably, to "improve the quality and accuracy of [his] tax services" and "to determine whether [he] meets the generally accepted professional standards for tax services," including adhering to the Board's ethical rules, the Order required Mr. Iley to submit to monitoring of his practice by a third-party accountant. *Id.* at 93. Furthermore, under the Order, Mr. Iley was obliged to submit quarterly reports to the Board in which, among other things, he was required to attest that he was "in compliance with" the Order—that is, the same Order that condemned his conduct of taking and not remitting client money. *Id.* at 95. At a minimum, then, the Order's monetary fine and forward-looking remedial obligations evince that the parties to the Order contemplated that, while on probation, Mr. Iley would cease the conduct that had given rise to the Order—even without an explicit injunction mandating that he do so. In other words, the Order was reasonably calculated to prohibit conduct that was the same as or similar to Mr. Iley's subsequent offense conduct. But Mr. Iley did not stop the conduct.

Furthermore, as in *Pentrack*, the Order clearly provided Mr. Iley "with adequate notice" that this conduct was "prohibited." 428 F.3d at 990. Like Mr. Pentrack, Mr. Iley could "hardly complain that he did not know" that his later

19

fraud contravened the substance of the Order. *Id.* at 991 n.3. Simply put, Mr.
Iley knew the Order prohibited the same or similar conduct comprising his
fraudulent scheme but he kept engaging in that conduct anyway, and, as a
consequence, his clients were defrauded. Thus, given the Order's notice and Mr.
Iley's subsequent conduct evidencing defiance of the Order, *Pentrack* is
persuasive support for the conclusion that the district court properly
determined—even without an express injunction—that Mr. Iley's conduct
"satisfies the requirements of § 2B1.1(b)([9])(C)." *Id.* at 991.

To be sure, as Mr. Iley is quick to point out, the order in *Pentrack* differs
from the Order here because it "specifically enjoined fraud." Aplt.'s Opening Br.
at 12. As such, though *Pentrack*'s reasoning is quite persuasive and illuminating,
we freely acknowledge that, standing alone, *Pentrack* does not directly control
our holding here. In short, standing alone, *Pentrack* is not dispositive. However,
*Pentrack* does not stand alone. Our holding—which is grounded in the specific
circumstances of Mr. Iley's case—finds further support in the decisions of our
sister circuits.

In the Fifth Circuit's decision in *United States v. Nash*, 729 F.3d 400 (5th
Cir. 2013), for example, an agency determined that Mr. Nash improperly accepted
food stamps for unapproved items. The agency then imposed a fine and sent Mr.
Nash a warning letter—a letter that the court consistently referred to as the "July

9 letter." *See, e.g.*, *id.* at 405. That letter "warned that failure to pay the fine would result in a six-month disqualification from" the food-stamp program and "made clear that imposition of the fine did not preclude further action in response to [Mr.] Nash's violations." *Id.* at 405, 406. Mr. "Nash acknowledged the violation and agreed to pay the fine." *Id.* at 402. But he nevertheless continued to accept food stamps for unauthorized items. Mr. Nash was ultimately indicted and convicted of a criminal offense stemming from his food-stamp fraud. The district court applied the § 2B1.1(b)(9)(C) enhancement in sentencing Mr. Nash, and he challenged this ruling on appeal.

At the outset, the Fifth Circuit defined Mr. Nash's challenge and its disposition: "We understand [Mr. Nash] to argue that because the July 9 letter did not expressly enjoin him from committing food stamp fraud in the future, he cannot now be found to have violated the [agency's] order. We find [Mr.] Nash's argument to be without merit." *Id.* at 404. Focusing on the substance of § 2B1.1(b)(9)(C),[8] the Fifth Circuit concluded that the "application of the enhancement 'requires some specific directive that the defendant can defy.'" *Id.*

---

[8] Though *Nash* conceded that the warning letter was "somewhat short of [§ 2B1.1(b)(9)(C)'s] literal terms" because it was not a "prior, specific judicial administrative *order*, injunction, decree or process," *Nash* ruled that the letter satisfied the substance of the enhancement. *See* 729 F.3d at 405 (emphasis added) (quoting U.S.S.G. § 2B1.1(b)(9)(C)). No such concession is necessary here, of course; it is undisputed that the Order qualifies as a prior "administrative order" under § 2B1.1(b)(9)(C). *See supra* note 4.

21

at 405 (quoting *United States v. Goldberg*, 538 F.3d 280, 292 (3d Cir. 2008)).

And the July 9 letter was such a directive because it effectively warned Mr. Nash

"that continuation of his fraudulent conduct was illegal." *Id.* at 406.  The court

opined that, while "'no court of appeals has held that a mere warning letter,

without more, can justify the enhancement,' the fine (itself the result of a

proceeding in which [Mr.] Nash participated) clearly 'ordered [Mr. Nash] to stop'

committing food stamp fraud." *Id.* (quoting *Goldberg*, 538 F.3d at 291–92).  And,

because Mr. Nash defied this order to stop, the Fifth Circuit concluded that Mr.

Nash was "exactly the type of defendant the enhancement was intended to apply

to"—that is, "one 'who has . . . demonstrate[d] aggravated criminal intent.'"  *Id.*

(second alteration in original) (quoting § 2B1.1(b)(9)(C) cmt. background).

Thus, the *Nash* court held that § 2B1.1(b)(9)(C) applied even though the July 9

letter did not expressly enjoin Mr. Nash from committing the specific fraudulent

conduct for which he later was criminally prosecuted.

It is patent that *Nash* bolsters the ultimate conclusion that we reach here.

Like in *Nash*, Mr. Iley's contention that the enhancement does not apply because

the Order did not explicitly enjoin him from engaging in the fraudulent conduct

underlying his offense is "without merit."  *Id.* at 404.  Analogous to *Nash*, Mr.

Iley was warned, in substance, through the Order "that continuation of his

fraudulent conduct" was prohibited.  *Id.* at 406.  Specifically, the Order identified

the acts of Mr. Iley that it sought to prohibit, including "taking possession of sufficient [client] funds to pay the taxes due" and then not "properly and promptly" paying those funds to the IRS. R., Vol. I, at 88. These were the same basic acts underlying Mr. Iley's fraudulent scheme. And, partly because of these acts, the Order fined Mr. Iley and placed him on probation, during which Mr. Iley was required to abide by certain conditions. Those conditions included practice monitoring and the requirement that he attest quarterly that he was "in compliance with" the Order—that is, an Order that condemned his conduct of taking and not remitting client money. *Id.* at 95. We are able quite naturally to read the Order's sanctions, including its monetary fine and forward-looking remedial obligations, as a firm and concrete warning to Mr. Iley to stop the conduct that had given rise to the Order. Further, as in *Nash*, the Order's sanctions here—viewed in totality—constituted a "specific directive that the defendant can defy." *Nash*, 729 F.3d at 405 (quoting *Goldberg*, 538 F.3d at 292). And, by continuing to engage in the kind of acts that the Order identified as worthy of sanction, Mr. Iley certainly did defy the Order's directive. Thus, as in *Nash*, Mr. Iley's subsequent fraudulent conduct made "him exactly the type of defendant the enhancement was intended to apply to." *Id.* at 406.

Nash distinguished circuit cases holding that a mere warning letter, without more, was insufficient to justify application of the enhancement. *Id.* It noted that

23

more was present in *Nash*; "the fine (itself the result of a proceeding in which [Mr.] Nash participated) clearly 'ordered [Mr. Nash] to stop' committing food stamp fraud." *Id.* (quoting *Goldberg*, 538 F.3d at 291–92).[9]  Like *Nash*, we also

---

[9]      As the Third Circuit recognized in *Goldberg*, one of those mere-warning cases is the Seventh Circuit's decision in *United States v. Wallace*, 355 F.3d 1095 (7th Cir. 2004).  *See Goldberg*, 538 F.3d at 291.  In *Wallace*, the Seventh Circuit reversed the district court's imposition of the Prior Order enhancement "where [the defendant] was told that his behavior was unlawful" and "[a]t this time he signed a 'Statement of Voluntary Discontinuance' prepared by the [agency], which was basically a promise by [the defendant] that he would not engage in similar fraudulent behavior in the future." 355 F.3d at 1096.  The *Wallace* court concluded that the Statement and surrounding circumstances were insufficiently specific and concrete to justify application of the Prior Order enhancement.  *See id.* at 1098 (unfavorably comparing this warning scenario to a situation where a defendant is under, *inter alia*, a consent decree); *see Goldberg*, 538 F.3d at 291 (deeming agency action insufficient to warrant application of the Prior Order enhancement where it does not lead "to a definite result, like a consent decree or seizure"); *Linville*, 10 F.3d at 633 (noting that "the Sentencing Commission did not intend to subject every recipient of relatively informal missives and official notifications and warnings of violations from administrative agencies to the extra penalties" of the enhancement, which were "designed for people" with more culpable intent).  *Wallace* offered a helpful illustration:

> To paint a clearer picture, we see [the defendant's] situation more resembling that of a driver receiving a warning from a police officer after being caught speeding. In this situation, like [the defendant], the driver knows she has violated a traffic law, she knows that if she speeds in the future she will be violating the law, and our driver will most likely have agreed to the officer's request that she "slow it down" and not violate the posted speed limits in the future. In cases of these informal warnings, the driver cannot be doubly fined the next time she is stopped and issued a ticket. The same is true of the [agency's] actions concerning [the defendant].   Without having engaged in *something more substantial* than preparing a "Statement of Voluntary Discontinuance", [sic] we cannot hold that [the
> (continued...)

24

can distinguish such cases because there is more here—indeed, there is more here than in *Nash*.

We need not, and thus do not, rely solely on a monetary fine (as in *Nash*) to distinguish such mere-warning cases. To be sure, the Order clearly imposed a substantial fine on Mr. Iley (i.e., $10,000), and it is a significant part of the calculus. But we also may rely here on the Order's imposition of a probationary term on Mr. Iley that had prospective, mandatory conditions. Coupled with the fine, these conditions were reasonably calculated to send the definite and concrete message to Mr. Iley that he should cease the conduct that had given rise to the Order—or, as *Nash* put it, that Mr. Iley should "stop" this conduct. *Id.* (quoting

---

[9](...continued)
        defendant] is subject to the [Prior Order] sentence enhancement
        . . . .

355 F.3d at 1098 (emphasis added). As explicated further *infra*, contrary to *Wallace*'s hypothetical, the Board's negotiations with Mr. Iley led to a "definite result, like a consent decree," *Goldberg*, 538 F.3d at 291. Instead of the Board simply informing Mr. Iley of the acts it sought to prohibit and, in effect, giving him a warning in the form of a sanctionless order (like the hypothetical warning for speeding in *Wallace*), the Board reached a negotiated agreement with Mr. Iley—memorialized in the Order—that resulted in the imposition of a substantial monetary fine and a probationary term. Together, these sanctions were reasonably calculated to send a firm and concrete message to Mr. Iley that he should cease the conduct that had given rise to the Order—*viz.*, Mr. Iley should "stop" this conduct. *See Nash*, 729 F.3d at 406 (quoting *Goldberg*, 538 F.3d at 291–92). *Cf. Flanders*, 491 F.3d at 1219 (holding that where the prior memorandum of understanding governing the defendant's conduct "only recommended board approval [for a certain asset sale]" and "did not mandate it" the memorandum did not sufficiently "restrict[] Defendant's conduct" to make his subsequent attempted asset sale a violation of the memorandum).

*Goldberg*, 538 F.3d at 291–92). Thus, *Nash* stands with our decision in *Pentrack*

in supporting the conclusion that we reach here.[10]

---

[10]     Although Mr. Iley's briefing never mentions the case, we recognize that the Third Circuit professed in *Goldberg* to embrace "a highly formalistic interpretation" of the Prior Order enhancement, 538 F.3d at 292 n.7, which at least at first blush would appear to be at odds with our *Pentrack* decision and our general approach here toward application of the enhancement. Under that formalistic approach, a prior warning would need to include not only a warning that the defendant's conduct is illegal, but also "the word 'desist' on that same line to tell him to stop[.]" *Id.* However, *Goldberg*'s actual legal analysis seems to significantly belie this first impression; that analysis appears to be centered on whether the agency's action resulted in a "definite result, like a consent decree or seizure"—that is, "some specific directive that the defendant can defy." *Id.* at 291–92 (citing *United States v. Spencer*, 129 F.3d 246, 252 (2d Cir. 1997) (holding the enhancement to be warranted in the consent-decree context), and *Mantas*, 274 F.3d at 1129–30 (upholding application of the enhancement where agency officially seized the defendant's contaminated and tainted meat by placing at tag on a cooler containing it)). The government's problem in *Goldberg* was that the agency's response to the defendant's wrongful conduct led to no such definite result. Specifically, the agency simply "twice warned" Mr. Goldberg that he "was violating" the law by distributing certain veterinary pharmaceuticals. *Id.* at 284. Mr. Goldberg, however, kept on distributing them, and he was later convicted of fraud. The district court thought the enhancement applied, but the Third Circuit disagreed.

So understood—as *Nash* also appeared to read it—*Goldberg* "is not contrary" to our approach here. *Nash*, 729 F.3d at 406 n.4. Here, the Board's negotiations with Mr. Iley produced a definite result—that is, an Order that was effectively a consent decree, as Mr. Iley admits. *See* Aplt.'s Opening Br. at 8 (noting that the Order was "effectively a consent decree"). This Order imposed a substantial fine on Mr. Iley and placed him on probation. And, under that probation, Mr. Iley was obliged to fulfill certain conditions that were designed to ensure that he did not repeat the conduct that led the Board to issue the Order in the first place—conduct such as taking his clients' money for the ostensible purpose of paying the IRS to satisfy their tax bills, but then failing to do so. Yet, after the Order issued, Mr. Iley defied it, continuing to take his clients' money without—as his clients expected—paying the IRS. In sum, the Order constituted

(continued...)

We can say the same thing with respect to the Eighth Circuit's decision in *United States v. Jokhoo*, 806 F.3d 1137 (8th Cir. 2015). There, a state agency issued administrative orders that revoked Mr. Jokhoo's business license and imposed "civil penalties after a hearing" on him for various fraudulent practices. *Id.* at 1139. Mr. Jokhoo nevertheless continued the same or similar practices and was subsequently indicted and convicted for doing so. At sentencing, the district court enhanced Mr. Jokhoo's sentence under § 2B1.1(b)(9)(C)—a decision that he challenged on appeal. The Eighth Circuit discerned no error in the enhancement, however. Citing *Nash*, it stated, "[t]he administrative order need not expressly enjoin proscribed conduct, but must direct a defendant to refrain from such conduct." *Id.* at 1141. The Eighth Circuit reasoned that, like the fine in *Nash*, the agency's "sanctions 'clearly ordered' [Mr.] Jokhoo to stop committing fraud, but the record shows that [he] continued to do so." *Id.* (quoting *Nash*, 729 F.3d at 406). And so the Eighth Circuit in *Jokhoo* held that "[t]he district court . . . did not err in applying the enhancement." *Id.*

---

[10](...continued)
the "definite result, like a consent decree," that the Third Circuit found to be missing in *Goldberg*. 538 F.3d at 291. And, consistent with *Goldberg*'s reasoning, the Order's fine and probationary conditions were tantamount to a "specific directive" that Mr. Iley could—and did—"defy." *Id.* at 292. Thus, our careful consideration of its actual legal analysis leads us to conclude—like the Fifth Circuit did before us in *Nash*—that *Goldberg* truly "is not contrary" to our approach here. Lastly, at the risk of stating the obvious: even if *Goldberg*'s approach were contrary to our own, as an out-of-circuit authority, *Goldberg* would not be controlling here.

*Jokhoo*'s application here is clear: it further undermines Mr. Iley's claim that § 2B1.1(b)(9)(C) cannot apply because the Order did not expressly enjoin him from defrauding his clients. Indeed, the Eighth Circuit directly rejected such a notion, stating that a prior "order need not expressly enjoin proscribed conduct." *Id.* Like *Nash*, the *Jokhoo* court found that the sanctions imposed on Mr. Jokhoo—including civil penalties—were sufficient to order him to stop his fraudulent conduct. The same is true here. Coupled with its $10,000 fine, the Order's forward-looking remedial obligations were reasonably calculated to send a definite and concrete message to Mr. Iley that he should cease (i.e., stop) the conduct that had given rise to the Order. But Mr. Iley did not stop. Consequently, as the court did in *Jokhoo*, we conclude that the district court rightly imposed the enhancement on Mr. Iley.

Mr. Iley musters little caselaw in favor of a contrary result. As noted, he has pointed out that the order in *Pentrack* differs from the Order here because it "specifically enjoined fraud." Aplt.'s Opening Br. at 12. But, as discussed *supra*, that fact ultimately does little for Mr. Iley. We have acknowledged that the different facts in *Pentrack* mean that, standing alone, that case is not dispositive. As demonstrated, however, *Pentrack* does not stand alone; persuasive circuit precedent like *Nash* and *Jokhoo* supports the conclusion that we reach here. The only other case involving application of the enhancement that Mr. Iley

affirmatively relies on to support his first argument is our decision in *United States v. Lewis*, 594 F.3d 1270 (10th Cir. 2010). Mr. Iley says that in *Lewis* "[t]his Court sustained the enhancement 'because some transactions in the Ponzi scheme violated' the 'order issued by the Nebraska Department of Banking and Finance.'" Aplt.'s Opening Br. at 13 (quoting *Lewis*, 594 F.3d at 1287). Mr. Iley's reliance on *Lewis*, however, is misguided. In the language from *Lewis* that Mr. Iley quotes as ostensibly stating the court's holding, the *Lewis* panel is actually describing the *district court's* rationale for imposing the enhancement—not the rationale of the *Lewis* panel. *See Lewis*, 594 F.3d at 1287 ("The district court imposed this enhancement because some transactions in the Ponzi scheme violated a cease-and-desist order issued by the Nebraska Department of Banking and Finance."). And neither the argument that the *Lewis* defendant presented to the district court nor the one he raised on appeal is even remotely relevant to the matters at issue here: "In the district court Lewis opposed the two-level enhancement on the ground that the *violation* of the order was not foreseeable. His argument on appeal is different. He now argues that the enhancement should not apply because he did not have knowledge of the order." *Id.* at 1288. In short, *Lewis* is inapposite. Thus, Mr. Iley's reliance on it is unavailing.

Mr. Iley does not fare much better by asserting that "the guideline's commentary . . . indicate[s] that circumstances like Mr. Iley's are outside the scope of § 2B1.1(b)(9)(C)" because it "confirm[s] that the guideline applies only where the defendant violated *the express* terms of a prior order." Aplt.'s Opening Br. at 11 (emphasis added). Mr. Iley notes that the one illustrative hypothetical in the commentary provides that "a defendant whose business previously was enjoined from selling a dangerous product, but who nonetheless engaged in fraudulent conduct to sell the product, is subject to this enhancement." U.S.S.G. § 2B1.1(b)(9)(C) cmt. n.8(C). However, Mr. Iley offers no argument to explain why we should view this hypothetical as helpful to him. Indeed, the hypothetical tells us nothing about the nature of the prior order that enjoined the sale of the dangerous product. Notably, notwithstanding Mr. Iley's conclusory suggestion to the contrary, *see, e.g.*, Aplt.'s Reply Br. at 9, the hypothetical does not tell us whether the prior order that enjoined the sale did so by it express terms or, as here, by its substance—*viz.*, by being "designed to prohibit prior misconduct of" the same or similar sort as the defendant's subsequent criminal conduct and by being "specific enough to provide the defendant with adequate notice of the prohibited conduct." *Pentrack*, 428 F.3d at 990–91. Therefore, the hypothetical does not advance Mr. Iley's cause.

Mr. Iley also posits that "[t]he commentary further states that the guideline applies when the defendant's fraud contravened a directive 'to take or not to take a specified action.'" Aplt.'s Opening Br. at 12 (quoting U.S.S.G. § 2B1.1(b)(9)(C) cmt. n.8(C)).   But, again, Mr. Iley does not explain why the quoted commentary language helps him.   More specifically, he does not tell us why any such directive to take or not take such action must itself be set out in explicit terms, if the directive's substance—like the Order's substance here—is "specific enough to provide the defendant with adequate notice of the prohibited conduct," *Pentrack*, 428 F.3d at 990, and reasonably calculated to send the definite and concrete message to the defendant that he should cease (i.e., stop) the conduct that gave rise to the order.   Moreover, in its analysis of the enhancement's history, the *Pentrack* court concluded that the "specified action" language was part of the "additional phrasing" that "merely clarifies the distinction between enhancements for bankruptcy and non-bankruptcy fraud."   *Id.*   Therefore, it does not seem that this language was ever intended to shed any particular light on whether a defendant's subsequent criminal conduct must violate the express terms of a prior injunction to qualify for the § 2B1.1(b)(9)(C) enhancement.   Indeed, importantly, this language did not stop the *Pentrack* panel from concluding that central to the specificity inquiry is simply whether "the injunction is specific enough to provide the defendant with adequate notice of the prohibited conduct."   *Id.*   And, as noted,

31

the Order here was specific enough for this purpose. In sum, the Guidelines commentary also lends Mr. Iley no succor.

In summary, we hold that, at least under the specific circumstances of this case, § 2B1.1(b)(9)(C) applies even though the Order did not expressly enjoin Mr. Iley from defrauding his clients. In particular, we conclude that § 2B1.1(b)(9)(C) may apply without an explicit injunction when, as here, the prior order (1) imposed a concrete punishment, such as a fine, on the defendant for the same or similar conduct at issue in the defendant's subsequent offense; (2) imposed prospective remedial conditions or obligations, like practice monitoring and the filing of quarterly reports—through a probationary term or otherwise—that were reasonably calculated to curtail future instances of the conduct at issue; and (3) nevertheless the defendant perpetrated that prohibited conduct while the order was still in effect.[11]

## B

We now take up the second question: Whether Mr. Iley's fraudulent conduct violated the Order where it expressly only punished him for negligent

---

[11]    Our holding with regard to the scope of § 2B1.1(b)(9)(C) is limited to the issues necessary to decide this appeal. We leave for another day the question of whether § 2B1.1(b)(9)(C) applies when, as in *Nash*, the defendant received a fine and a warning, but was not expressly subject to any prospective remedial conditions or obligations. We similarly decline to decide whether the enhancement would apply when the crime was committed *after* any prospective features of the prior order had expired.

conduct.  Mr. Iley claims that his offense conduct did not violate the Order "[b]ecause negligence is not similar conduct to fraud."  Aplt.'s Reply Br. at 14 n.4.  He maintains that, just as "a dog distinguishes between being stumbled over and being kicked," we should distinguish between negligence and fraud.  *Id.* at 13 (quoting Oliver Wendell Holmes Jr., THE COMMON LAW at 3 (1881)).  In more prosaic language, he contends that "a warning against being sloppy" does "not amount to a warning not to steal clients' money."  *Id.* at 14 n.4.  Thus, Mr. Iley argues that by defrauding his clients, he did not violate the Order's "warning against being sloppy."  *Id.*

But, importantly, Mr. Iley offers us no reason to read a symmetry-of-mental-state requirement into § 2B1.1(b)(9)(C), or any on-point legal authority that would support such a step.  And there is reason to question whether the Sentencing Commission contemplated such a significant limitation on the universe of defendants qualifying for the enhancement.  *Cf.* U.S.S.G. § 2B1.1 cmt. n.8(C) (setting forth a hypothetical illustrating the enhancement's application that ascribes no particular mental state to the prior conduct that gave rise to an injunction—involving the sale of a dangerous product—but that nevertheless deems the enhancement appropriate where the defendant is expressly described as engaging in "fraudulent conduct to sell the [same or similar dangerous] product").

Indeed, in this regard, a defendant who commits certain conduct with a high level of culpable intent *after* being formally warned against committing the same underlying conduct, while possessing a lower level of culpable intent, would seem to be even more worthy of the enhancement than a defendant who simply engages in the same prohibited conduct again, while possessing the same, lower level of culpable intent. That is because such a defendant seemingly would have displayed even more of the "aggravated criminal intent" that § 2B1.1(b)(9)(C) aims to punish. U.S.S.G. § 2B1.1 cmt. background. Put another way, that defendant would seemingly be more worthy of the enhancement because, not only would his subsequent criminal conduct indicate that the prior order did not deter him from engaging in the same prohibited conduct with the same level of culpable intent, but it also did not deter him from brazenly upping his game—*viz.*, from engaging in the same or similar prohibited conduct with a higher level of "aggravated criminal intent." *Id.*

In this case, Mr. Iley evinced such brazen, and thus more sanction-worthy, conduct. The Order warned him that negligently harming his clients by taking their money ostensibly to pay their taxes to the IRS and then not doing so was prohibited and merited punishment and intrusive probationary conditions, like practice monitoring. Then, while still on probation for this negligent conduct, Mr. Iley fraudulently misrepresented to his clients that he was taking their money

34

to pay their taxes to the IRS and then knowingly diverted the money for other personal uses. That is, Mr. Iley engaged in essentially the same or similar conduct when perpetrating his fraudulent scheme—the only critical difference being that, after being formally warned against doing so, he acted anyway with an even more culpable state of mind (i.e., fraudulently). As such, the district court certainly did not err in ruling that Mr. Iley acted with the kind of "aggravated criminal intent" that § 2B1.1(b)(9)(C) penalizes. *Id.* In other words, we hold that Mr. Iley's fraudulent conduct in not paying his clients' funds (as promised) to the IRS could and did violate the Order, even though by its explicit terms the Order only sanctioned Mr. Iley for his negligent commission of the same or similar acts.

## IV

In conclusion, for the foregoing reasons, the district court did not err in applying the two-level enhancement under § 2B1.1(b)(9)(C) in Mr. Iley's case. Accordingly, we **AFFIRM** the court's sentencing order.

17-1269, *United States v. Iley*

**HARTZ**, **J**., Circuit Judge, concurring.

I concur in the judgment and all of Judge Holmes's fine opinion except the discussion of *United States v. Nash*, 729 F.3d 400 (5th Cir. 2013), and *United States v. Jokhoo*, 806 F.3d 1137 (8th Cir. 2015). In particular, I agree with the opinion's determination that the context of the Order of the Colorado Board of Accountancy made clear that the fraudulent conduct of which Defendant was later convicted would be a violation of the terms of his probation under the Order.

In my view, Judge Holmes's opinion is fully convincing without any need for support from *Nash* and *Jokhoo*. And I think those two decisions are misguided because they in essence transform USSG § 2B1.1(b)(9)(C) into a recidivist provision, increasing a defendant's offense level simply because the defendant had previously been penalized by a court or administrative agency for similar misconduct. *See Nash*, 729 F.3d at 406–07 (Garza, J., dissenting). I am therefore reluctant to embrace the reasoning that brought those courts to their holdings (even though Judge Holmes's opinion is careful not to endorse the holdings in the two cases).

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
## OFFICE OF THE CLERK
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

Elisabeth A. Shumaker
Clerk of Court

February 04, 2019

Chris Wolpert
Chief Deputy Clerk

Mr. Josh Lee
Office of the Federal Public Defender
Districts of Colorado and Wyoming
633 17th Street, Suite 1000
Denver, CO 80202

RE:       17-1269, United States v. Iley
          Dist/Ag docket: 1:16-CR-00284-CMA-1

Dear Counsel:

Attached is a copy of the opinion of the court issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(a)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. If requesting rehearing en banc, the requesting party must file 6 paper copies with the clerk, in addition to satisfying all Electronic Case Filing requirements. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R. 35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Elisabeth A. Shumaker
Clerk of the Court

cc:    Karl L. Schock

EAS/at